This next case is case number 4-17-0070, Glynn v. Town of Normal. Appearing for the appellant is attorney Michael Reagan, and for the appellee is attorney Ellen Emery. Good morning. Good morning. Counsel, are you ready to proceed? We are. You may. May I please report, counsel? My name is Mike Reagan, and together with Dave Wise seated with me at the counsel table, we represent the plaintiffs, George and Irene Glynn. I know that the court is familiar with the facts, and we're not supposed to talk about them, but there are two facts which I wish to discuss before we begin this clear-up. First, with respect to the speed limit and warning signs, the defendant wrote that the plans and specifications did not provide for the removal or placement of any speed limits signage. There is no record site, so we don't know what the defendant was looking at in saying there was no such requirement. But there is no doubt here that the placement of the speed limit sign and the lower advisory limit sign was central to the defendant having been able to obtain approval and funding to reconstruct the bridge. They were an absolute requirement if the bridge was to be open to use. Defendant's initial proposed plan coming from the defendant was rejected precisely because it did not contain a sufficiently reduced speed limit. Normal then proposed a counter speed limit of 10 miles an hour, but then it was determined you can't do that. You're not allowed that, but the speed limit itself is that low. So that's when, working with IDOT, they came up with a proposal for the 20-mile-an-hour speed limit and the 10-mile-an-hour advisory warning signs. The defendant's police report showed after the bridge was open and before this accident that the required 10-mile-an-hour speed limit warning was posted. But on the day of the accident, the applicable speed limit was 30 miles an hour because of the default to the statute. We have documented defendant's police reports showing numerous prior accidents. The second fact I want to talk about is the defendant's description of the record as to what Mr. Flynn and Mrs. Laird did on the bridge, and with respect we say it's misleading and one-sided. Mr. Flynn was not lollygagging on the bridge, casually looking at paint. They both said that everything happened very quickly. Mrs. Laird said that everything occurred in about one minute to the best of her estimation. Mr. Flynn was first concerned about whether Mrs. Laird had been injured. It was his primary focus in his words. He then reacted to Mrs. Laird saying that maybe there was damage to her bumper. And he said, since I rear-ended her, I didn't want her to think I was being uncooperative about whether or not it needed to be reported. And he also expressed in his deposition, in the record, that he was aware that there's a dollar limit which governs whether or not you have to report the accident. So turning to the first legal issue. The circuit court erred in deciding that Mr. Flynn was not an intended and permitted user of the bridge within the meaning of Section 3-102 of the Tort of Needle Act. The defendant acknowledges, acknowledged in his motion for summary judgment, that plaintiff's claim here is that the defendant was, quote, negligent in the ownership, maintenance, and operational control of the bridge. The defendant argues that he did not have the duty to make the bridge safe for pedestrians to walk on. The defendant doesn't seriously contest that it had a duty, which would be classified as ministerial, to maintain the speed signs. And the defendant doesn't seriously contest that that duty was owed to motorists on the bridge. Rather, defendant's argument is that he did not owe that duty to Mr. Flynn once he stepped out of his vehicle. Defendant asks that adverse consequences be attached by this court to their description of Mr. Flynn as a, quote, pedestrian. To do that, they borrow the definition of pedestrian from another completely unrelated statute. Being a pedestrian alone has no significance, is not mentioned in 3-102, and the only term that is used in 3-102 is user. There are several instances in the case law, well familiar to this court, in which people walking on roadways are regarded as being intended and permitted, whether they're called pedestrians or not. People in crosswalks, people exiting illegally parked cars, and people unloading a truck in a particular location. A key part of our case here is that the case law supports viewing Mr. Flynn while he was out of his car for that brief moment as a permitted and intended motorist. When he was driving on the bridge, there was a duty to maintain the signs in the circle for his protection. When he exited his vehicle following the accident, which was caused by defendant's negligent means, he did so in a legal, foreseeable, and reasonable manner. In Green v. The City of Chicago, Illinois Supreme Court case, a car stalled in an area where the lighting was off, negligently maintained, and that was the gist of the successful action against the city. The driver exited his car and went to his trunk to get out of flare. While he was doing that, he suffered the same fate as Mr. Flynn did, in that a car, unable to see him, struck and pinned him against his car, resulting in the amputation of his legs. Counsel, the appellee seems to assert that the basis for the finding in, or the ruling in Green, was that there was a legal obligation to put out flares. What's your response to that? They do, and with all due respect to counsel, they are completely wrong about that. They even cite to you a statute, which is not mentioned, inferred, implied, or anything else in the case, involving vehicles of the second class, as I recall, and they have to be over 10,000 pounds, they have to be carrying 10 or more people, or they have to be a commercial truck. And those people have to put out flares. And as we've documented in our brief, the Supreme Court, numerous times within its opinion, refers to Mr. Green as being driving an automobile, and that he got a flare out of his trunk. And so that is, and that's their only distinguishing feature to the case, and they've put that in several places in this brief, and it's just simply wrong. Later in the case, and I've sought advice on how to pronounce Wojdyla, it's as close as I can come, versus the city of Park Ridge, the Supreme Court described its opinion in green. And the court said there, quote, We determined the city had a duty to the plaintiff there that the motorist was an intended user of the street. In Sweat versus Village of Algonquin, the appellate court also had cause or reason to describe green. And in more expansive language, it said that in green, the plaintiff was a motorist, a person using the street as it was intended to be used, despite the fact that he was hit by another motorist, while he was standing on the roadway behind his disabled vehicle. And the court, the appellate court summarized, he was nonetheless utilizing the street as a motorist, not as a pedestrian. There's another case we cited, Ramirez, that also describes green in the same fashion. And I suggest to the court that it is stunning that the defendant's brief does not address those aspects of Wojdyla, Sweat, or Ramirez at all. And the only distinction they offer to you with respect to green is this business, well, he was probably going in response to the statute, but that's clearly not the case. The fact that Mr. Flynn got out of his vehicle is reasonably foreseeably related to his status as a motorist. Sections 11-401 and 402 of the Motor Vehicle Code require a motorist involved in an accident to shall immediately stop, render aid, and then fulfill other duties that are set out. The defendant belittles Mr. Flynn's efforts to comply with that statute, saying that he acted with a, quote, thrash disregard for the law, and also that no one was injured. But, of course, that wasn't known until Mr. Flynn got out of his car and went to check on Mrs. Laird. They say that Mr. Flynn elected to exit his vehicle to inspect for aesthetic damage on the vehicle's bumper, but he was checking on Mrs. Laird and also inspecting her vehicle. They say that he should have stopped somewhere else, but the vehicles in front of him were already stopped. And they say that the statute said he shouldn't interfere with traffic. But, again, the vehicles in front of him were already stopped, and interference with traffic has absolutely nothing to do with the resolution of this case whatsoever. More importantly, if the defendant really wants to contest any of those aspects of compliance with the statute, then those are fact questions for the jury and couldn't, should not, have been determined by summary judgment. We developed how, well, as I say, we have counsel if there had not been an accident and plaintiff's car would just stop, became disabled, engine shut down for some reason. And then plaintiff exits the vehicle and walks to get off the bridge, and then it gets hit by a car. Would plaintiff be a pedestrian under that hypothetical? I'm trying to accommodate all of your facts, including your saying he was walking to get off the bridge. And I suppose that I'd have to treat that case a little differently. That is, if he had gone on beyond the car and was simply walking in the middle of the pavement and then was walking and there was a sidewalk there, that would be a difficult case for me to argue to the contrary. But if his car became disabled, stalled, for whatever reason... Okay, well, if he was just looking under the hood, see if you can figure out why the car shut down. I can't tell you the name of the case right now, but I think there is such a case in which the plaintiff was permitted to recover. He was looking under the hood of a Ford, but I forget the name of the plaintiff. So I'm not very helpful to you. Okay, well, it probably wasn't a very good hypothetical anyway. But I think I understand why you distinguish CISC, but could you just briefly do so in your argument? Do what, please? CISC, the Williamson County... Oh, yes, I would love to talk about CISC. I've learned that even though it's later in the outline, I want to talk about it right now, which is... And it relates to my next point. It is the duty which exists and already exists in favor of Mr. Flynn is narrow in its scope and already exists. And so CISC then illustrates that. Because in CISC, I think maybe he hit the bridge with a pothole, whatever. The vehicle stopped and couldn't move. So he got out of the car and was walking, much like your hypothetical. The edge of the bridge was obscured by foliage and he fell off the bridge. And that was the nature of the injury. And the court said, well, you know, we don't require municipalities to make country roads safe to walk on. And so there's an immense difference between CISC and our case. Because here we are not complaining at all about any lack of safety in walking on the bridge. We're saying that if the duties owed to motorists, that is the sign and the circle we're complied with, then this summary judgment is completely wrong. And in CISC, the error there was... Excuse me, the negligence there was related to the maintenance of the road surface itself. And so I see CISC as an extremely different case. And there are other cases. So the defendant's primary cases in the court picked CISC as the first of those and the one they liked the most. But they also talk about Vaughan versus City of West Frankfurt. And there the plaintiff was not permitted to recover when he, as a pedestrian, stepped into a hole in the street. So their cases talk about maintenance of the road surface for walking as opposed to the existing duty already owed to motorists. I'd like to, for time reasons, turn to the next error, which the court heard in deciding the defendant had demonstrated a lack of proximate cause as a matter of law. The circuit court reasoned that plaintiff, the words of the court, was unable to show how the crest of the bridge and the lack of any speed limits signs caused Mr. Flynn to exit the vehicle and get in between the cars. And the court went on to say that the cause was Mr. Flynn getting out of the vehicles and getting in between the vehicles. There are many fundamental problems with that ruling with all due respect to the trial court. First, it implies that the court thought that there can only be one proximate cause of an accident.  Second, the court does not recognize the rules which are to be applied when there are multiple proximate causes, which we discussed at length in our brief. Third, the court lost sight of the circumstance that this case came before him on a motion for summary judgment. And proximate cause is just a quintessential question of fact in these cases and couldn't possibly have been practically decided on a motion for summary judgment. The primary rules of decision all run in the plaintiff's favor here. All presumptions and inferences must be taken in favor of plaintiffs. Proximate cause is a question of fact. Defendant bears the burden of demonstrating that as a matter of law, proximate causation between the defendant's negligence and Mr. Flynn's injury could never be found. It wasn't the plaintiff's obligation to set something up. It was the defendant's when they want to talk about intervening and other and additional causes. The rules of decision on condition not cause or intervening causes also run in favor of the plaintiffs in this issue. The Supreme Court held in Davis v. Marathon that the defendant remains liable for its negligence if the intervening event was foreseeable, which it clearly was. And further, the Supreme Court said that to escape liability, defendant must demonstrate that the intervening event was unforeseeable as a matter of law. There is a palpable, obvious proximate cause relation between the defendant's negligence, which we assert, which was the elimination of these critical speed signs, and the elimination of the traffic circle and this injury. Both accidents happened for that reason, one after the other. And these accidents are why IDOT ordered the reduced speed limit so that it could keep this bridge, which it wanted for other valid municipal purposes, but with an immensely dangerous crest in this age of automobiles. These accidents, both of them, were not only foreseeable, they were inevitable, and they had happened many times before. And the law in this court talked about the fact that for an intervening event to break the chain of causation, it has to be freakish, it has to be fantastic, it has to be unforeseeable. And that's simply not the case here. And a key case here is Bentley v. Salomon Township, which is from the Supreme Court, cited for decades frequently. Stop sign obscured by foliage, and the defendant said, okay, yeah, well, that was true, but the drivers should still have been on the lookout. The court said, no, intervening negligence doesn't break the chain of causation. And in Greene v. City of Chicago, the car that hit the man, hit the plane, was driven by an intoxicated motorist. And the court said there that even criminal acts do not break the chain of causation. We've also said, we've established the law that the defendant need not be able to perceive the exact method or the exact means by which this intervening event occurred, and the defendant has said nothing about that. The next issue, the third of these issues, is that the statute of repose has no application to this claim of negligence. And the court said, with respect, wrongly, that this is really just a design case, and it's not a design case. We are not complaining about the design of the bridge. We are not complaining about how it was constructed originally. That means originally when it was reconstructed. And if the city had kept it as the way it was constructed, then we would not have a case here. But they didn't. And they permitted, either they permitted the reduced speed limit signs to be removed and not replaced, or they removed themselves. We don't know. And they also reduced the, or eliminated the traffic coming in the circle. Mr. Reagan, in fairness, looking at the allegations and the complaint, it does appear that there are a couple that are aimed at the original construction. One being the nature of the surface, not having the necessary coefficient of friction or something along those lines. You're absolutely correct, Your Honor. Those allegations are in the amended complaint. They're nowhere in our brief. So the trial court was correct in terms of applying the 10-year statute of opposed to those specific allegations of negligence? The trial court was not as discriminating as you are here and didn't talk about those things. And I think, as my recollection of the transcript is that all they talked about was the crest. But I think you and I are on the same page. There's a question here as to those other allegations of the complaint which are nowhere otherwise discussed, and I'm certain that the circuit court did not discuss those either. The circuit court talked about the crest, and that was it. We're not complaining about the crest. We're complaining about the horrific absence of these essential speed signs. And these are all things, this is maintenance. These are all things that occurred after construction. There was a debate in the case law. Defendants cite Sitka, O'Brien, and Wright. Again, I don't think they have any bearing here because those cases deal with, again, harkening back to what is the constructed defect. And that's not what this case is all about at all. And we've discussed the cases in our brief, and we've distinguished them. And the late Justice Joseph Gordon talked about this divide in the law, and he said Ryan is the better view of things, and we think that applies. But I respectfully suggest I don't think the court's going to fall in line with their cases. The last order, the last issue here, which will take 30 seconds perhaps, is to ask after the summary judgment is granted for Lee to file a Second Amendment complaint. It wasn't the 32nd. It was the Second Amendment complaint, and that, Lee, was denied. But it doesn't become relevant unless this court finds for some reason that, you know, there is something that's being talked about here that wasn't in the complaints. And the fact of the matter is we demonstrated in depth in our brief that everything that's here for discussion today was talked about in the summary judgment papers, both by us and by the defendant as well. So there was no surprise whatsoever. I have three seconds left. Are there any questions? Pretty well timed. If the court were to agree with your argument in regards to the summary judgment, would you agree that there's no need to address the trial court's denial of Lee to allow the filing of the amendment? I would agree because it would be remanded for a minute. First of all, it wouldn't control anything that's going on here. Secondly, then when the case is remanded, it would be remanded for all further appropriate proceedings, and then the question of amendment could be presented again. Okay. Thank you. Thank you. Ms. Emory. Good morning. I think you'll all agree that for this case and what is before you, there's a lot of issues, and so to hit them all in 20 minutes might be a little difficult, but I'll do my best. Appellant's brief states, quote, plaintiff's case is grounded on that negligent failure of maintenance and is not grounded upon the construction of the bridge itself or on the danger involved in the design of the crest. Counsel reiterated that. However, that's not what the complaint or the amended complaint say. Plaintiff had four years to amend their complaint. They only alleged design defects of the Camelback Bridge. There is not one mention of failure to maintain signage or the traffic circle. In fact, there's no need for any signage but for the vertical crest on the bridge itself, and by saying that the crest is not at issue, that's begging the question. If you continually refer to an obstructed sight line when you discuss either the facts or the law, as plaintiff does, then you are talking about the crest of the bridge because that is the issue about whether there was an obstructed sight. Counsel, aren't they talking about the failure to keep up the precautions that were put in place? I mean, the crest decision was made to keep the crest, but then the decision was also made in order to keep the crest that certain signs had to be put up, you were going to have this turnaround, and those things were done. So they're talking about the change in doing those things or the failure to do those things after a period of time. Your Honor, the 30-mile-an-hour default speed limit we know was there, and there was a 10-mile-an-hour advisory that was put on westbound traffic, the opposite side of the bridge, as Wayne Aldrich, the Public Works Director, testified. That sign was there on the day of the accident and is there today. 10-mile-an-hour going westbound because right at the bottom of the bridge there was a road, Hillcrest, that crossed Virginia Avenue, that the bridge was. Mr. Flynn was eastbound. The 10-mile-an-hour regarded westbound traffic. The traffic calming circle, as Mr. Aldrich testified to, was to slow traffic because of Hillcrest crossing Virginia right at the bottom of the bridge, and so many people had hit it, and plows had hit it, and there were always chunks of concrete, that it didn't do its job. It caused more collisions. So that was a decision to take out that traffic calming circle. I understand that, but are you disputing opposing counsel's representations regarding what had to be put in place in order for the city to be able to keep this bridge? Yes. The city had advisories and a plan with IDOT. The eastbound 20-mile-an-hour sign was never installed. There isn't any issue or any evidence of a removal. It was never installed. And similar to the Roberson v. City of Chicago case, the fact that the city had an agreement with IDOT to build and maintain a median, that the court said it had no duty to the plaintiff as a pedestrian on the median. They said any agreement to construct or maintain between a municipality and IDOT has nothing to do with a pedestrian who appears on the scene, and the agreement to construct and maintain certain peripheral things. And you're using the word pedestrian. Yes. And of course that stands out. Yes. And I guess that brings us to the issue of whether Mr. Flynn was a pedestrian or a motorist. Right. The cases are clear that you look at, as to whether someone is an intended and permitted user of a street when they are on foot. It is the intent of the municipality, not the intent of the pedestrian. And the Vaughn case says, it is the nature of the property where the plaintiff is injured that determines whether a duty is owed. So they look at the property itself. SISC says, we need look no further than the property itself to determine the municipality's manifestations of intent with regard to use of the property by pedestrians. Camelback Bridge in Normal has clearly pedestrian use. Our walkways down the sides of the bridge for pedestrians, across Constitution Trail, which is used by joggers and walkers, the old rail line that's now park stuff, goes across and walkways back up to the other side of the bridge, clearly show that the intent of the municipality was to not have pedestrians on the bridge. There are no markings on the bridge for walkways. There are no markings on the bridge for parking, which would allow motorists ingress and egress. Clearly the municipality's intent is that pedestrians stay off the bridge. I doubt that Mr. Reagan would disagree with anything that he just stated there. He would just simply reply that Mr. Flynn was not a pedestrian, that he was a motorist who was involved in a traffic accident and exited his vehicle to determine whether or not the other driver was hurt or not. And it's that status that we're inquiring about here. So, when he exited his vehicle, then is he an intended and permitted user? No, he's not. And why not? Because he then makes himself a pedestrian when he goes out and says, you know, Ms. Laird, are you hurt? No. Then goes between the cars to inspect for a coin-sized paint chip damage. He has made himself a pedestrian. Both Ms. Laird and Mr. Flynn testified that they were familiar with the bridge, had known it their whole lives. When the accident occurred, the cars were not disabled, not at all. They could have moved their cars a little bit down and off to the side to get clear of the bridge. They both testified to that. When they stopped where they were and Mr. Flynn got out, he made himself a pedestrian. Cases cited by plaintiffs in their brief talk about motorists who got out of the car and were still motorists. Those cases were against the defendants who were the other car who hit them. When you're not talking about the Tort Immunity Act, Section 3-102, and you're talking about, in this case, Ms. Vias, Mr. Flynn did not become a pedestrian for purposes of Ms. Vias when she came over the hill and hit the back of his car. Under the case law, his case was good against Dr. Vias. She was an anesthesiologist coming home from work when she came over that bridge and hit the standing car. And the cases are clear that they're not against municipalities who are going against or who are discussing the Tort Immunity Act in this situation. They are also cases that go against the manufacturers of the automobiles. There's one against Ford Motor Company where it says the person got out of the car and was still a motorist because your defective auto part caused the truck to become disabled, requiring the person to get out. Those had nothing to do with the Tort Immunity Act that we are discussing about intended and permitted users. Let me take the situation that you were maybe suggesting that this isn't, and that is you suggested here it wasn't that the car, Mr. Flynn's car, wasn't capable of being driven. But let's say it did result. Let's say you have an accident where the cars are now inoperable because of the collision itself. And there's a concern about the safety of the other motorists. So Mr. Flynn in that situation gets out of his vehicle to check on the safety of the other motorists, or is suspicious that perhaps there's a potential for a car fire, wants to exit his vehicle to escape that potential danger. Even then are you saying that he becomes a pedestrian by getting out of his vehicle? Under Greene, it would have been a similar situation because Greene's car was disabled and he got out of the car. Interestingly enough, there was no discussion until later cases about permitted and intended user in the Greene decision. However, when you get out on the bridge and there's no place for pedestrians, it's like if your car becomes disabled on I-55 and you have to get out of the car. You get out of the car and you don't stand in the traffic lane. You get to a place of safety. I'm trying to hone in on duty here, and I'm trying to identify in the hypothetical I described, are you saying still in that situation Mr. Flynn would be a pedestrian and not an intended and permitted user of the roadway? Correct. So he becomes a pedestrian as soon as he opens the door and steps out onto the pavement? Yes. Or does he become a pedestrian when he goes and inspects the damage and gets in between the two cars? I think that when he gets out and steps onto the pavement, he becomes a pedestrian, which is not an intended or permitted user. And there's also cases that talk about someone may be a permitted user but not intended. Does it matter that that would be reasonably foreseeable, that someone would need to, because of an accident or because the car becomes disabled, get out of their vehicle? That still doesn't impute liability under this circumstance. That's what I'm asking. So the fact that it's reasonably foreseeable doesn't make any difference? Correct. I mean, it could be reasonably foreseeable that a little kid, you know, wanders onto the street too and somebody, like the one case, doesn't blow their horn and hits them. A lot of things, they're foreseeable, okay, and you imagine them. But it's not a reasonable realm of foreseeability for a municipality to say somebody might, for reasons whatever, become disabled on the bridge and they'll have to get out. That doesn't then make it the municipality's responsibility for their safety on the bridge. But it just maybe answers the question as to whether or not they were an intended and permitted user. Mr. Reagan was talking about the Green case and the subsequent cases that have identified the motorist in Green as an intended and permitted user. What do you say to that? Like I said before, if you go with the premise that such a situation is foreseeable, the foreseeability has to be something that you can guard against. Where is the duty? I mean, we're looking at foreseeability going back and imputing some duty. I'm sorry, I may not be specific in my question. The issue here on appeal, strictly as to duty, only as to duty, is entirely whether or not Mr. Flynn was an intended and permitted user. None of the other duty elements were argued on appeal here. So it's just strictly as to whether or not he's an intended and permitted user. And it would seem that the Green plaintiff was similarly situated, and the Supreme Court identified the Green plaintiff in a subsequent case as an intended and permitted user. So how do you reconcile that finding with the circumstances here, which Mr. Reagan argues leads to the conclusion that Mr. Flynn was an intended and permitted user? Mr. Flynn's decision to get out of the car without moving the car to a place of safety, which they could have done, is different than Green. Green's car was disabled and he had to get out of it. Just like Justices Turner's hypothetical of the car is disabled and you have to get out of it. But I disagree. Well, I asked you that situation earlier, about that situation earlier, and you said, no, that individual would be a pedestrian. And I understand, but that's why I'm saying you're saying in the situation here, and yet you're talking about the Green case. In the situation we have here, Mr. Flynn clearly became a pedestrian when he got out of the car and didn't move it off the road to a safe place. And that does not make him an intended and permitted user. That's using the viewpoint of the pedestrian, not of the municipality, such as the cases say. It is the viewpoint and the intent of the municipality, not the pedestrian, that makes them intended and permitted. What about approximate cause? We've spent a lot of time on intended and permitted uses here. This, and the briefs are clear that we have alleged that anything that the city may have neglected to do created a condition. It was not the proximate cause of the accident. It was a condition where then there was Dr. Bias' coming over the bridge and inattentiveness that caused the injury and subsequent damages to Mr. Flynn. Anything the city may have done, that the town of Normal may have done, created merely a condition. It was not a cause of the accident. And so if the protections were in place, would they have likely prevented these accidents? I don't believe so because Mr. Flynn testified, as did Dr. Bias. They were familiar with the bridge. They had driven over it hundreds if not thousands of times. Mr. Flynn testified that his speed was only 25 miles an hour, and there's also the statute which requires you to reduce speed when you come over the crest of a hill or upon the approach of the crest of a hill until you can see that your way is clear. So I don't believe that the speed limit, if there had been a 20-mile-an-hour speed limit, would have stopped the accident. Also, as counsel said, there are narrow exceptions to the rules as far as the intended and permitted users. The cases are in the briefs. I'm going to move on to the statute of repose. The appellants state in their brief at page 20, as Mr. Flynn came over the sharp crest of the bridge at 25 miles an hour, he encountered Mrs. Laird's vehicle which was stopped in traffic. Lacking sufficient distance to stop because of the insufficient sight line, he collided with the rear of her vehicle. That shows that, once again, they are talking about the insufficient sight line, which was because of the crest of the vehicle. That is a design and construction defect. All of it is inherent in the design of the whole program, but anytime they say that the speed limits should have been lower, there was an obstructed sight line, there was a difficult sight line, it goes to the design defect, which is beyond the 10-year statute of limitations. Granted, they did lower the bridge. The sight line was not as bad as it used to be, but due to the historical nature of the bridge and IDOT approved the plans, they kept the characteristic Camelback hump, which is why it's called Camelback Bridge. The Sitcoe v. McDermott case says that the purpose of the construction statute of repose is to insulate all participants in the construction process from the onerous task of defending against stale claims. In their brief, plaintiffs cite two cases regarding power suppliers that have to maintain the power supply for gas, electricity, utilities every day, and when something, they had a pipe fitting that was defective, they said that is not included in the construction statute of repose because that is different. Here, we had a clear design of a bridge, we had a construction of a bridge, and the appurtenances and anything which relates to that construction and design, if deemed to be a defect, is barred by the construction statute of repose, which expired in 2011. Mr. Flynn's accident was in 2012. Ms. Emery, you're out of time. If you'd like to wrap up. Yes. Basically, that's the, again, I'll just reiterate that I think the plaintiffs should have amended their complaint if they were going to then proceed on a design defect, not on a design defect, drop the design defect argument. They should have tried to amend their complaint in the four years before a motion for summary judgment was granted because this was all after the fact and under the case law, untimely and inappropriate to try to amend. Thank you. Okay, thank you. Mr. Reagan, rebuttal argument? Please. On that last point, page 21 of our brief, we quote defendant's motion for summary judgment where the defendant said the case is about, plaintiff's case is about, quote, the defendant was, quote, negligent in the ownership, maintenance, operation, and control of Candleback Bridge. And then the motions for summary judgment went on to discuss speed, traffic circle, and all issues of the case. There's simply no doubt about it. The defendant never said a word during the summary judgment process about, wait a minute, speed or the traffic calming isn't an issue in this case. There was an important misstatement of facts, which started December's conversation here, in which she said that the speed limit was only supposed to apply to westbound traffic. There is not a breath of that in the record. It was not an issue raised at all in the circuit court, and there's nothing about that in the briefing before this court. It's a brand new argument. We also suggest that it's completely wrong and could never be documented. That is just categorically not an issue in the case. Never was and is not now. She told you that Green and the other cases I cited in the Green process here, the progeny, were against the other motors. That's not true. The name of the case is Green v. City of Chicago. And that was a case against the city. And then the other cases that we talked about, all in discussing and characterizing Green, also talked about it in the language of 3102. We're not plucking intended and permitted out of the air for tax purposes or something. We are talking about cases which talk about a motorist out of his car because it's inoperable, or it's there in the pavement, within the meaning of 3-102. You said that this was not reasonably foreseeable. The accident wasn't. Our brief, I think Justice Turner was talking about this, our brief starting at page 27 for a couple pages, and again at page 34 for a couple pages, we document case after case in which either motorists or even people out of restaurants who saw an accident come out onto the pavement and try to help, and that this is foreseeable and reasonably foreseeable. And then in terms of rear-end collisions, we have the quote from the Supreme Court, which says that a rear-end accident is the most common type of accident and is completely foreseeable. On the scope of the duty, I want to say that as my last remark in just a second. Turning the statute of repose for just a second, they again here, as they did in their brief, try to portray this as our case, as being a design case because everything, quote, relates to the crest of the bridge, and it is not the case at all. She talks about, she quotes at length the fact that we couldn't see because of the inadequate sight distance, but the stopping distance, which is explained in our statement of facts in a separate section, relates to speed. I mean, if you were traveling at one mile an hour, it might be safe to come over this hill. At 30 miles an hour, it is fatally dangerous. And so it is, our complaint is about the speed signs and the speed-related traffic calming signal, and those were maintenance signs. And although they were necessitated by the crest of the bridge, nonetheless, they are a separate allegation of fault, which we're talking about. The last thing to give this court assurance, so to speak, of what we ask for here is, again, and I'm repeating from my main argument, that the duty to a motorist already exists here, and that the scope of the duty, which we believe that we fit under, already exists and is narrow, and that is our complaint has to do with the lack of safety of the bridge for the operation of motor vehicles and not for pedestrians to walk on it. This case will not stand for the proposition that once you get out of your car, you have to have a pristine paved path on which to walk. That's not any part of this case. It's the question that motorists, pardon, don't lose their status as motorists as they put their first foot out of the car onto the pavement, and that the duty we invoke is the duty to have that bridge safe for the operation of vehicles. Thank you, Your Honor. All right. Thank you, counsel. Thank you both. The case will be taken under advisement, and a written decision shall list.